UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

NICK GIOIA, ANTONIETTA ZAPPIER, and DAN         Case No. 22-cv-06710 (PMH)
SCHUY, individually and on behalf of others similarly
situated,

                           Plaintiffs,         **FIRST AMENDED
COLLECTIVE AND
CLASS ACTION
-against-                     COMPLAINT_____**

PROJECT VERITAS,                    **<u>JURY TRIAL DEMANDED</u>**

                           Defendant.

-------------------------------------------------------------X

       Plaintiffs amend the caption to read as follows:

-------------------------------------------------------------X

NICK GIOIA, ANTONIETTA ZAPPIER, LEON
SCULTI, PATRICE THIBODEAU, CASEY
FLOWERS, and DAN SCHUY, individually and on
behalf of others similarly situated,

                           Plaintiffs,

                 -against-

PROJECT VERITAS, S2 HR SOLUTIONS 1A, LLC
(d/b/a ENGAGE PEO LLC), TOM O'HARA, and
JAMES O'KEEFE,

                           Defendants

-------------------------------------------------------------X

       Plaintiffs Nick Gioia, Antonietta Zappier, Leon Sculti, Patrice Thibodeau, Casey

Flowers, and  Dan Schuy, by their undersigned attorneys, Advocates for Justice, Chartered

Attorneys, for their Complaint against Defendants allege as follows:

**INTRODUCTION**

1.     This is a class and collective action for monetary and other relief brought by employees of the defendants under Section 16 of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216, Section 502 of the Employee Retirement and Income Security Act, 29 U.S. Code § 1132, and  Sections 198, 652 and 663 of the New York Labor Law ("Labor Law"). Plaintiffs allege that defendants, two of which are "Joint Employers" and two of whom are the principal officers of Project Veritas failed to pay employees overtime compensation required by the FLSA, failed to pay employees employed in New York overtime compensation required by the New York Labor Law, and classified some employees as "independent contractors" so as to avoid paying for their health insurance benefits or overtime. This action is both an FLSA Collective Action, and a class action addressed to both New York Labor Law violations and ERISA violations.

**JURISDICTION AND VENUE**

2.     The jurisdiction of this Court is invoked pursuant to Section 16 of the FLSA, 29 U.S.C. § 216 (b), Section 502 of the Employee Retirement and Income Security Act, 29 U.S. Code § 1132 and Sections 1331 and 1367 of Title 28 of the United States Code.

3.     This action is brought in this District pursuant to 28 U.S.C. § 1391(b).

**PARTIES**

4.     Plaintiff Nick (Nicholas) Gioia was employed by Defendants Project Veritas ("PV") and Engage PEO LLC ("Engage") as a video editor from on or about May 2019 until on or about October 2021.

5.     Plaintiff Antonietta Zappier was employed by Defendants PV and Engage  as an "administrative assistant" from on or about September 23, 2019, until on or about March 30,

2022. On March 30, 2022 Plaintiff Zappier signed a Separation Agreement which was neither knowing or willful, and which was signed under duress. See paragraph     below.

6.      Plaintiff Leon Sculti was employed by Defendants PV and Engage as a Senior Video editor from August 2017 through April 2018, as a Field Operations Manager from April 2018 through August 2018, and as Director of Field Operations from August 2018 through June 2021.

7.      Plaintiff Patrice Thibodeau was employed by Defendants PV and Engage as a video editor and videographer from December 17, 2019 through September 15, 2020.

8.      Plaintiff Casey Flowers was employed as a journalist from on or about June 2019 until January 2022 when he was terminated. Upon termination Plaintiff Flowers signed a Separation Agreement which was neither knowing or willful. More specifically see Paragraph 44-45, *infra.*

9.      Plaintiff Dan Schuy was employed by Defendant as a video editor from on or about September 2018 until on or about April 2019.

10.     Each plaintiff was, at all relevant times, an "employee" within the meaning of Section 3(e)(1) of the FLSA, 29 U.S.C. § 203(e)(1), 29 U.S. Code § 1002(6) and Section 190(2) of the NY Labor Law. It is not alleged the Plaintiff Sculti was not an "employee" under any of these statutes after August 2018.

11.     Defendant Project Veritas ("PV") is a Virginia nonstock, nonprofit corporation with its principal place of business in Mamaroneck, New York. PV is an organization recognized as exempt from federal taxation as a charitable and educational organization under section 501(c)(3) of the Internal Revenue Code of 1986 as amended. Project Veritas is a right-wing

nonprofit organization, which has become notorious for conducting undercover "sting"

operations aimed at progressive organizations and Democratic Party campaigns and committees.

12.     Project Veritas, while headquartered in Mamaroneck, New York, dispatches

"undercover reporters", editors and videographers to locations throughout the United States to

engage in these "sting" operations, with crews and employees often staying located in other

states for months at a stretch. It receives contributions in excess of $22 million per year, and

spends those sums on the work of its more than 100 employees throughout the country.

13.     The modus operandi of Project Veritas is to gain access to the offices of these

organizations and campaigns through fraudulent misrepresentation; then to secretly videotape

conversations and interactions with personnel of the organizations and campaigns; then to

selectively edit the videotapes so as to distort and misrepresent what was said; and then to

publicly release those selectively edited portions of the videotapes.

14.     Defendant PV, given the national scope of its work, and its financial income and

expenditures, is an "enterprise engaged in commerce" within the meaning of Section 3(s)(1) of

the FLSA, 29 U.S.C. § 203(s)(1), and are "employers" within the meaning of Section 3(d) of the

FLSA, 29 U.S.C. § 203(d), is an employer as defined at 29 U.S. Code § 1002(5), and Section

190(3) of the NY Labor Law.

15.     Defendant S2 HR Solutions 1A, LLC d/b/a Engage PEO LLC ("Engage") is a

Florida Limited Liability Corporation which does business in many states, providing Human

Resources and payroll services to other employers. Its main place of business is in Clearwater,

Florida. Engage is a "co-employer" of all of PV's employees, along with PV. Engage is an

"enterprise engaged in commerce" given the multi-state nature of its work, and an "employer"

within the meaning of Sections  3(d) and 3(s)(1) of the FLSA, 29 U.S.C. § 203 (d) and (s)(1), is

an employer as defined at 29 U.S. Code § 1002(5) and is an "employer" within the meaning of Section 190(3) of the NY Labor Law.

16.     Defendant Tom O'Hara, at all relevant times, was the Chief Financial Officer of PV. Defendant James O'Keefe, at all relevant times, was the Chief Executive Officer of PV. These two defendants, at all relevant times, exercised operational control over employees, and are "employer[s]" under § 3(d) of the FLSA, 29 U.S.C.A. § 203(d), because their role within PV, and decisions they made, directly affected the nature of the conditions of employees' employment, including payment of overtime and classification.

## CLASS AND COLLECTIVE ACTION ALLEGATIONS

17.     Plaintiffs bring their New York State law causes of action on behalf of a class of similarly situated employees, to wit, non-managerial employees of Defendants who within the six years prior to August 7, 2022 were not paid overtime, or the "spread" required by New York Law.

      a.     the class is so numerous that joinder of all members is impracticable;

      b.     there are questions of law or fact common to the class;

      c.     the claims or defenses of the representative parties are typical of the claims or defenses of the class;

      d.     the representative parties will fairly and adequately protect the interests of the class;

      e.     inconsistent or varying adjudications with respect to individual members of the class would establish incompatible standards of conduct for the parties opposing the class;

f.      adjudications with respect to individual members of the class, would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; and

g.      the parties opposing the class have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

18.    Plaintiff Flowers brings his claim under the Employee Retirement Income Security Act causes of action on behalf of a class of similarly situated employees, to wit, non-managerial employees of Defendants who within the three years prior to August 7, 2022 were classified as "independent contractors," and who, as a result, did not receive health insurance pursuant to the Employees' health insurance plan.

a.      the class is so numerous that joinder of all members is impracticable;

b.      there are questions of law or fact common to the class;

c.      the claims or defenses of the representative parties are typical of the claims or defenses of the class;

d.      the representative parties will fairly and adequately protect the interests of the class;

e.      inconsistent or varying adjudications with respect to individual members of the class would establish incompatible standards of conduct for the parties opposing the class;

f.      adjudications with respect to individual members of the class, would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; and

g.      the parties opposing the class have acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole.

19.    Plaintiffs also bring this action, to the extent it pleads FLSA claims, as a Collective Action under the FLSA. Each person similarly situated to the Plaintiffs who affirmatively opts into this action by filing a Notice of Consent was also employed by Defendants PV and Engage as an employee, in a non-exempt position, within the three years prior to this complaint being filed, worked in excess of 40 hours per week, and was not paid overtime. Each person similarly situated to the Plaintiffs who affirmatively opts into this action, by filing a Notice of Consent, performed duties which included logistical work, computer repair and troubleshooting, research, arranging events, video editing, interviewing, videotaping, and writing. This action is brought on behalf of Plaintiffs and all persons similarly situated who chose to opt in under procedures applicable to wage and hour claims, as determined by the Court.

## FACTS RELEVANT TO ALL CLAIMS

20.    Plaintiff Gioia generally worked 55-60 hours per week at an hourly rate of $26.44 or less, without being paid at all for the time he worked over 40 hours and without being paid one-and-one-half times the hourly wage for hours in excess of 40. On most days, Plaintiff worked more than ten hours in one day, but was not paid one hour of bonus pay at the minimum wage rate for each day he worked more than ten hours.

21.    On most days Plaintiff Gioia worked from 9 a.m. until some time between 7 and 8 p.m. He worked at PV's office as a video editor, cutting down footage submitted by "journalists" who worked in the field, and at times helping with the editing of finished videos which were the published on PV's website or on YouTube. The Project Veritas website described the video

editor's job as follows: "The primary responsibility of the Video Editors (VE's) is to assist the

Production Manager and Executive Producer in the handing of all video captured by PV and

PVA. This includes the timely cutdowns of all UCJ videos. VE's will assist in 'bucketing' of

content for review. The Video Editors are expected to recognize and mark any possible content

and to also mark any video that may be useful to the field operations leadership in training,

elicitation and future operations. The VE's will also assist the effort in development and

production on Keynote presentations for JOK and others, electronic and physical graphic tools

for the communications and development departments. The VE's will assist in the management

of all production equipment, including UCJ undercover cameras and covert recording equipment,

the editing hardware and software and any and all of PV's production camera's lights etc."

22.     From about May 2019 through mid-March 2020, at the start of the COVID

Pandemic, Plaintiff Gioia kept time sheets documenting his overtime work, but was never

compensated as per the time sheets. After May 2020 he ceased submission of time sheets, even

after returning to the office full-time. This extensive work, performed for about 50-70 hours per

week, was performed during every week that Plaintiff Goia was employed and not on vacation.

Plaintiff reserves the right to amend and provide precise hours when he gains access, through

discovery, to his work email and PV's computerized record payrolls, and video files.

23.     Plaintiff Zappier generally worked 50-60 hours during every workweek, at an

hourly rate of $31.25 per hour, without being compensated at all for the time she worked over 40

hours and not being paid one-and-one-half times the hourly wage for hours in excess of 40. On

most days, Plaintiff Zappier worked more than ten hours in one day, but was not paid one hour of

bonus pay at the minimum wage rate for each day she worked more than ten hours.

24.    Plaintiff Zappier's work was done both at the PV Office and at home. She regularly arrived at 7:30 a.m. to start answering calls on the "Tip Line." She would work all day answering calls from employees and performing assigned administrative tasks. She would leave work at around 5 p.m., and resume taking calls from employees, arranging flights and hotel bookings, setting up Ubers, etc. When hired in 2019, Stacy Goran (Mrs. Zappier's predecessor) advised Mrs. Zappier that she would have to be on call 24/7 for James O'Keefe, PV's CEO. Later, she was advised by the head of Human Resources, Jen Kiyak (who also directed her not to keep a time sheet), that she could stop answering the phone at 10 p.m. Nevertheless, she made a number of runs to the office after midnight at O'Keefe's behest. Plaintiff also worked between 10 and 20 hours on the weekends. This extensive work, of 50-70 hours per week was performed during every week that Plaintiff Zappier was employed and not on vacation. Plaintiff reserves the right to amend and provide precise hours when she gains access, through discovery, to her work email and computerized records.

25.    Plaintiff Sculti generally worked between 45 and 60 hours per week throughout his tenure at PV as Senior Video Editor, and then worked 7 days a week, for more than 60 hours, when he became Field Operations Manager. He was paid at an hourly rate of $23.25 - $33.65 when he worked as a Senior Video Editor, and at $48.26 per hour when he worked as Filed Operations Manager. On no occasion was he when being paid at all for the time he worked over 40 hours and without being paid one-and-one-half times the hourly wage for hours in excess of 40. On most days, Plaintiff worked more than ten hours in one day, but was not paid one hour of bonus pay at the minimum wage rate for each day he worked more than ten hours.

26.    On most days Plaintiff Sculti worked from 9 a.m. until sometime between 7 and 8 p.m.  Plaintiff Sculti, while working as a Senior Video Editor:

- Reviewed and edited down raw video footage;

- Cleaning up audio;

- Assisted producers in writing scripts;

- Assisted with camera shoots;

- Assisted with basic graphics designs;

- On limited occasions performed "covert" operations as an "under cover journalist" (UCJ)";

- Performed operational research and analysis of targets, venues and other subject matter related to undercover operations;

- Provides operational and technical feedback to UCJs in the field;

- Help coach UCJs in relevant operational subject matter and elicitation techniques; and

- Assisted in the planning and modification of various operations as part of a team as requested.

27.     While working as a Field Operations Manager his responsibilities largely included:

- Routine, regular and consistent feedback to each UCJ as a result of critical analysis of every piece of rough tape and cut down from their meetings (within at least 48 hours of the meeting).

- Monthly session with each UCJ to review key pieces of their tape one-on-one (either in person or remote) for teachable moments and broader feedback including analyzing transcripts.

- Mandatory participant in all spin cycle sessions. Research targets and relevant topics prior to each session, distribute findings to colleagues in advance, craft possible lines to take, contribute to coaching the UCJ and maintain the spin cycle logs.

- Track the guidance given to an individual UCJ in a spin cycle session vs. their performance in the subsequent meeting and thereby hold them accountable for the level of implementation and incorporate the lessons learned into future coaching.

- Act as the subject matter "expert" and PV resource on elicitation techniques. Development of new quarterly training material for the UCJs.

- Act as lead open source intelligence (OSINT) researcher for Operations Management of OSINT resources (databases and tools). Developing OSINT skills of all the UCJs. Tasking and monitoring of research-minded UCJs on OSINT projects and requirements.

- Collation, cataloging and maintenance of a library of key pieces of all PV tape for coaching, training, and demonstration purposes.

- Development of a training module on the tradecraft of camera and audio devices (distinct from technical aspects).

- Participation in UCJ operations on a case-by-case basis.

28.     Plaintiff Sculti reserves the right to amend and provide precise hours when he gains access, through discovery, to his work email and computerized records. Based on his own records he can estimate that he is owed overtime (time over 40 hours) as follows:

| **TIMESHEETS** | **HRLY WAGE** | **OT HRS** |
|---|---|---|
| Pay period ending 09.08.18 | 43.2693 | 68 |
| Pay period ending 08.25.18 | 43.2693 | 46 |
| Pay period ending 08.11.18 | 43.2693 | 56 |
| Pay period ending 07.28.18 | 43.2693 | 24 |
| Pay period ending 07.14.18 | 43.2693 | 24 |
| Pay period ending 06.30.18 | 43.2693 | 28 |
| Pay period ending 06.16.18 | 43.2693 | 3 |
| Pay period ending 06.02.18 | 43.2693 | 6 |
| Pay period ending 05.19.18 | 43.2693 | 1 |
| Pay period ending 04.21.18 | 33.6539 | 26 |
| Pay period ending 04.07.18 | 33.6539 | 27 |
| Pay period ending 03.24.18 | 33.6539 | 2 |
| Pay period ending 03.10.18 | 33.6539 | 2 |
| Pay period ending 02.24.18 | 33.6539 | 4 |
| Pay period ending 02.10.18 | 33.6539 | 2 |
| Pay period ending 01.27.18 | 33.6539 | 6 |
| Pay period ending 01.13.18 | 33.6539 | 22 |
| Pay period ending 11.04.17 | 31.2500 | 6 |
| Pay period ending 10.21.17 | 31.2500 | 19.5 |

29.    Plaintiff Thibodeau generally worked 60-100 hours per week (many days he worked as long as 20 hours) at an hourly rate of $26.44 or less, without being paid at all for the time he worked over 40 hours and without being paid one-and-one-half times the hourly wage for hours in excess of 40. On most days, Plaintiff worked more than ten hours in one day, but was not paid one hour of bonus pay at the minimum wage rate for each day he worked more than ten hours. Up until around March 2020 Plaintiff Thibidau submitted a time sheet; even though it showed more than 40 hours of work he was never paid for more than 40 hours of work. After returning from working out of the office after the COVID epidemic struck, James O'Keefe instructed him to stop reporting his time. Plaintiff reserves the right to amend and provide precise hours when she gains access, through discovery, to his work email and computerized records.

30.     On most days Plaintiff Thibodeau worked from 9 a.m. until sometime between 7 and 8 p.m. He worked at PV's office, and at times on the road, as a video editor, cutting down footage submitted by "journalists" who worked in the field, and at times helping with the editing of finished videos which were the published on PV's website or on YouTube. At times he would work as a videographer in "undercover" operations,", ie. Secretly filming individuals who were speaking with PV "undercover journalists." He also, when requested, taught others how to do secret video surveillance of a conversation going on between a PV "journalist" and a subject.

31.     Plaintiff Flowers was employed as an "undercover journalist." Although he resided in California, he was sent to work in between 17-20 states. He was told where to go, and and was assigned to a team, and was told what to focus on and the type of sound byte which was needed. He was given all equipment, and disguises to wear.

32.     When Plaintiff Flowers was first hired in June 2019, he was told that he was not going to be paid as an hourly employee. Instead, he would be paid at $200/day, no matter how many hours he worked, and that he was considered an independent contractor. As an Independent Contractor Plaintiff Flowers generally worked 50-70 hours per week.   As an Independent Contractor he did not receive health, dental and vision insurance coverage offered to all employees. In April 2020 he was  told that he was going to become an employee at an hourly rate of $25.72/hr, or $53,500 per year. New York and California income taxes were deducted. He received dental, vision and health insurance. After this switch his workday actually increased to 18-20 hours a day, without payment of any overtime.

33.     In around January 2021 Plaintiff Flowers and his spouse had a son. He asked for paid parental leave (and was given two weeks paid, two weeks unpaid) and after repeatedly

requesting to do work closer to home (he had been assigned to work in Seattle ,Washington) he was terminated from employment.

34.     At no time was Plaintiff Flowers paid at all for the time he worked over 40 hours and nor was  paid one-and-one-half times the hourly wage for hours in excess of 40. On most days, Plaintiff Flowers worked more than ten hours in one day, but was not paid one hour of bonus pay at the minimum wage rate for each day he worked more than ten hours.

35.     During Plaintiff Flowers' first few months at PV he filled out a time sheet, and was recording the actual time worked. Thereafter he was told to put 8 hours on his time sheet for every day he worked, no matter how many hours he worked.

36.     Plaintiff Schuy generally worked 55-60 hours per week at an hourly rate of $26.43 or less, without being paid at all for the time he worked over 40 hours and without being paid one-and-one-half times the hourly wage for hours in excess of 40. On most days, Plaintiff Schuy worked more than ten hours in one day, but was not paid one hour of bonus pay at the minimum wage rate for each day he worked more than ten hours.

37.     On most days Plaintiff Schuy worked from 9 a.m. until sometime between 7 and 8 p.m. He worked both in PV's office, where he would generally listen to lengthy video or audio files, choosing material which could be useful in a story PV was planning to publish, and forwarding that to his supervisor. He also did graphic design while in the office. At times he would be sent out in the field to work with an "undercover journalist" who would be taping (both with audio recording and video recording equipment) a subject who was unaware that he/she was being recorded. Plaintiff Schuy would operate a remote camera taping the interactions, and then would edit the studio tapes submitted by the "journalist" and transcribe what was said, sometimes working as much as 20 hours in a day. Plaintiff Schuy kept and submitted time sheets

documenting his overtime work to HR Director Kiyak, but was never compensated as per the time sheets. This extensive work, of 50-70 hours per week was performed during every week that Plaintiff Zappier was employed and not on vacation. Plaintiff reserves the right to amend and provide precise hours when she gains access, through discovery, to her work email and computerized records.

38.    None of the Plaintiffs were paid any sums, much less overtime  pay (1.5 times their rate of pay), for the work they did in excess of 40 hours in any given week during the time they were employed as employees by Defendants. This failure to pay overtime was willful.

39.    Up until May 31, 2020, plaintiffs, kept a time sheet (with an instruction to some not to ever enter time over 40 hours per week). After that date plaintiffs were instructed not to fill out time sheets.

40.    The other non-managerial employees of PV worked similar schedules, with their time spent either in the office or in field. "Investigative" journalists (who were principally researchers, as opposed to "undercover journalists," who worked in the field) worked in the office late into every evening, and often on weekends. Video editors also worked in the office, or in the field late into every evening. None were paid for the work they did over 40 hours, none were paid overtime pay and none were paid spread of hours. Their work hours and their schedules were known to the executives and HR staff at PV and Engage, including Defendants O'Hara and O'Keefe, all of whom purposefully refused to pay overtime.

41.    Defendant PV's leadership staff, including Defendant O'Hara, on more than one occasion, met to discuss its unlawful scheme to not pay overtime to employees, and to classify many employees as independent contractors. One such meeting occurred on May 29, 2019 in

which the topic of video editors, specifically, not being exempt from overtime was acknowledged, explained, and discussed.

**The Independent Contractor Subterfuge**

42.    In the aforedescribed May 29, 2019  meeting, a conversation was held regarding 1) the history and potential consequences of Project Veritas' knowing, misclassification of undercover journalists and video editors as independent contractors, 2) the deprivation of healthcare and unemployment benefits, paid vacations, sick leave, workers compensation, and other rights and protections under federal and state labor and employment laws for for employees misclassified as independent contractors, 3) the evasion of payments for proper tax revenue due to multiple state governments and the federal government, including income, Social Security, Medicare, and unemployment taxes when employees were misclassified as independent contractors.

43.    At those meeting Project Veritas executives estimated that each employee misclassified as an independent contractor resulted in a 20-30% savings in payroll costs for Project Veritas, and acknowledged that, through conversations with Project Veritas representatives, Vanessa Matsis-McCready, an attorney at the organization's co-employment agency, Engage PEO, was made aware that Project Veritas was misclassifying undercover journalists as independent contractors, and told Project Veritas representatives it seemed to her that they were all employees.

**The Releases of Zappier and Flowers**

44.    Both Plaintiff Zappier and Plaintiff Flowers signed separation agreements, containing releases of FLSA and all other statutory claims.

a)    Zappier's release, which ran only to PV and not Engage,  was signed on a morning during which an incident involving a gun and a PV employee occurred at her house, after which she was called into a room, told she was being fired for something she had done a year earlier, without any opportunity to review it or consult an attorney, literally as she was walked out the door. She had an attorney revoke the agreement within a week, in part because it did not allow any time for consideration or revocation as required by the Older Worker Benefit Protection Act.

b)    Flowers' release was sent to him, along with his termination notice; he was terminated after repeatedly asking for an assignment closer to where his wife and new-born son were living. He was told to immediately sign the release, which contained a statement that he would be paid two weeks pay, which was a sum due to him as vacation pay. Flowers who has no legal or business education, was not given time to consult an attorney, and was not properly compensated for the breadth of the release he signed. He was of the understanding that he had to sign the release as part of terminating his relationship with PV and Engage.

45.    In neither case can the Separation Agreement/Release signed by these Plaintiff enforceable because neither Plaintiff had the proper opportunity to review and understand it, and the release  not "knowing and voluntary, as required by *Bormann v. AT & T Communications, Inc.,* 875 F.2d 399, 402–03 (2d Cir.1989).

46.    The allegations set forth above are incorporated by reference into the causes of action below.

## FIRST CAUSE OF ACTION
### Minimum Wage - FLSA
**(Collective Action)**

47.     Defendants have violated Section 6 of the FLSA, 29 U.S.C. § 206, by failing to pay Plaintiffs and Plaintiffs' Class the minimum wage for each hour they worked. Defendants' failure to pay Plaintiffs the minimum wage for all of their hours worked was willful within the meaning of the FLSA. Defendants are liable to Plaintiffs and Plaintiffs' Class in the amount of the unpaid compensation, plus liquidated damages in the amount of the unpaid compensation.

## SECOND CAUSE OF ACTION
### Minimum Wage – New York Labor Law
**(Class Action)**

48.     Pursuant to New York Labor Law §§ 198 and 663, Defendant is liable to Plaintiffs and Plaintiffs' Class in the amount of the minimum wage compensation they were due under New York Labor Law § 652 and New York Compilation of Codes, Rules and Regulations, Title 12, Section 142-2.1, to receive but were, in fact, not paid, plus liquidated damages equal to 100 percent of the total amount of the wages found to be due.

## THIRD CAUSE OF ACTION
### Overtime - FLSA
**(Collective Action)**

49.     Defendant has violated Section 7 of the FLSA, 29 U.S.C. § 207, by failing to pay Plaintiffs and Plaintiffs' Class at one-and-one-half times their regular rate of pay for each hour they worked in excess of 40 during a workweek. Defendant's failure to pay Plaintiffs time-and-a-half for their overtime hours worked was willful within the meaning of the FLSA. Defendant is liable to Plaintiffs and Plaintiffs' Class in the amount of the unpaid compensation, plus liquidated damages in the amount of the unpaid compensation.

**FOURTH CAUSE OF ACTION**
**Overtime – New York Labor Law**
**(Class Action)**

50.     Pursuant to New York Labor Law §§ 198 and 663, Defendant is liable to Plaintiffs and Plaintiffs' Class in the amount of overtime compensation they were entitled by Labor Law §§ 650 *et seq.* and New York Compilation of Codes, Rules and Regulations, Title 12, Section 142-2.2, to receive but were, in fact, not paid, because of Defendant's failure to pay at one-and-one-half times their regular rate of pay for each hour they worked in excess of 40 during a workweek, plus liquidated damages equal to 100 percent of the total amount of the wages found to be due.

**FIFTH CAUSE OF ACTION**
**Spread of Hours – New York Labor Law**
**(Class Action)**

51.     Pursuant to New York Labor Law §§ 198 and 663, Defendant is liable to Plaintiffs in the amount of compensation they were entitled pursuant to Labor Law §§ 650 *et seq.* and New York Compilation of Codes, Rules and Regulations, Title 12, Section 142-2.4, to receive but were, in fact, not paid, because of Defendant's failure to pay Plaintiffs the required daily spread-of-hours compensation, for each day they worked more than ten hours, plus liquidated damages equal to 100 percent of the total amount of the wages found to be due.

**SIXTH CAUSE OF ACTION**
**Erisa Losses to "Independent Contractors"**
**(Class Action)**

52.     With respect to Plaintiff Flowers, and the class of employees misclassified as "independent contractors" Defendants are liable to Plaintiff Flowers and his class in a sum compensating them for the lack of employee benefits, including but not limited to health insurance, dental and vision insurance, holiday pay, and vacation pay.

**TRIAL BY JURY**

53.     Plaintiffs request a trial by jury on all claims asserted herein.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that this Court:

1.      Declare that the releases signed by Plaintiffs Zappier and Flowers are void

2.      Certify Plaintiffs as representatives of a class of persons similarly situated for litigation of the state law claims;

3.      Certify Plaintiff Flowers as the representative of a class of persons similarly situated for litigation of the ERISA claim.

4.      Enter such orders as are necessary to certify this case as a collective action under the Fair Labor Standards Act;

5.      Order Defendants to make a complete accounting to Plaintiffs and Plaintiffs' classes of the hours that they worked on a weekly basis and of all payments Plaintiffs received in compensation for the six-year period preceding the commencement of this action;

6.      Order Defendants, jointly and severally, to pay to Plaintiffs all unpaid wages due and owing because of Defendant's failure to compensate Plaintiffs and their class both at minimum wage and at a rate of time and one-half their regular rate of compensation for each hour worked in excess of 40 during each workweek, and one hour of pay for each day each worked more than ten hours;

7.      Order Defendants, jointly and severally, to pay liquidated damages pursuant to the FLSA, 29 U.S.C. § 216(b), Labor Law §§ 198 and 663, and any other applicable statute, rule, or regulation;

8.    Order Defendants, jointly and severally, to pay all employees in the class of employees misclassified as independent contractors a sum compensating them for the benefits lost as a result of the misclassification.

9.    Order Defendant to pay Plaintiffs' reasonable attorneys' fees, costs, and prejudgment interest; and

10.    Grant Plaintiffs and their classes such other and further relief as the Court deems proper and just.

Dated:  New York, New York
        September 20, 2022

                                ADVOCATES FOR JUSTICE,
                                CHARTERED ATTORNEYS
                                Attorneys for Plaintiffs

                                By:_____/s/ *Arthur Z. Schwartz*_____
                                        Arthur Z. Schwartz
                                        Richard Soto
                                225 Broadway, Suite 1902
                                New York, New York 10007
                                (212) 285-1400